# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### ALASKA COMMERCIAL CO. v. DEBNEY.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1906.)

### No. 1,200.

PROCESS—SUBSTITUTED SERVICE—LAWS OF CANADA—CONSTRUCTION.

Defendant, by his own testimony, while residing in Yukon Territory, Canada, conveyed an interest in a mining claim to an agent of plaintiff as security for an indebtedness to plaintiff, and, at the time he left that territory for Alaska, had not obtained a reconveyance of the property, which he had sold to his brother. Before leaving he gave to his brother a written power of attorney to transact any and all business relating to his interests in Yukon Territory, which letter of attorney was never revoked, and was used by his brother in making a settlement of defendant's indebtedness and obtaining a conveyance . of the property. *Held* that, although defendant before leaving had sold all of his property in the territory, the power of attorney constituted his brother his agent and legal representative within the territory on whom legal service of process against him might be made under section 14 of Consolidated Ordinances of the Northwest Territories of Canada 1898, p. 198, which provides that, "in case any defendant is out of the territories but has an agent, managing clerk or other representative resident and carrying on his business within the same," service of the writ of summons may be made on such agent or representative, and that a judgment there obtained against defendant on a service so made was valid, and, no fraud being alleged, conclusive on the merits when sued on in a court of the United States, under the rule of comity which is recognized between the courts of the two countries.

In Error to the District Court of the United States for the Third Division of the District of Alaska.

Thomas A. McGowan, Ostrander & Donohue, and William Thomas, for plaintiff in error.

John R. Aitken, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This action was brought in the court below upon a judgment theretofore entered in the Territorial Court of Yu-

144 F.—1

kon Territory, Canada, for $6,270.96, and costs taxed at $248.60, in an action there brought by the plaintiff against the defendant, upon an account for goods and merchandise sold and delivered to him by the plaintiff, and upon a promissory note for $2,610.69, with interest, executed by the defendant to one Milan, and by him afterwards assigned to the plaintiff.

In the complaint filed in the court below the plaintiff joined with the count upon the Canadian judgment counts for the goods and merchandise sold and delivered to the defendant, and upon the promissory note executed by him to Milan, and by the latter assigned to the plaintiff. The court below, on the motion of the defendant, struck from the complaint the counts upon the promissory note and for the goods and merchandise, on the ground that they were merged in the judgment, and were therefore irrelevant and immaterial.

In his amended answer the defendant denied all of the allegations of the complaint, except that in respect to the corporate capacity of the plaintiff, and also set up in defense that the Canadian court that gave the judgment sued upon in this action never acquired jurisdiction of the defendant; that at the time that action was commenced the defendant was an actual bona fide resident of the District of Alaska, United States of America, and a native-born citizen of the United States, and was not in the Territory of Yukon, Dominion of Canada, and had no notice or knowledge of the action in the Dominion of Canada until the summons and complaint in the present-action were served upon him; that the defendant did not own any property, real or personal, in Yukon Territory, Dominion of Canada, at the time the action there was commenced, and that no summons, complaint, process, or notice of any kind in that action was ever served upon the defendant, personally or by publication, or upon any person authorized to admit service of process for the defendant; that he never appeared in that action, either in person or by attorney; and that no order for service of summons or process by publication was ever made by the Territorial Court of Yukon Territory, Canada, in the said action.

The plaintiff filed a reply to the amended answer of the defendant, alleging, among other things, that at the time of the commencement of the action against the defendant in the Territorial Court of Yukon Territory it was provided by the Consolidated Ordinances of the Northwest Territories, which ordinances were by "An act to provide for the government of the Yukon District, Canada," passed by Her Majesty, by and with the advice and consent of the Senate and House of Commons of Canada, and assented to June 13, 1898, made the laws in and for the said Yukon Territory, Canada, that personal service of the writ of summons in actions pending in the court of the said territory shall be effected by copy by personal service anywhere in the territory, and in case any defendant is out of the territory, but has an agent, managing clerk, or other representative resident and carrying on his business within the same, service may be made upon such agent, managing clerk, or other representative; that in the month of September, 1900, the defendant nominated and appointed Albert W.

Debney his true and lawful agent, representative, and attorney, to represent him and transact all his business in Yukon Territory, Canada, which appointment has never been revoked, and still remains in full force and effect; that the writ of summons and statement of claim in the action there brought were duly served upon the defendant by delivering copies thereof to the said Albert W. Debney, defendant's agent, attorney, and representative in Yukon Territory, and that the amended statement of claim and writ of summons were duly served upon the said defendant in the same manner; that service of all the said papers was duly and regularly made by the defendant in accordance with the laws in force in Yukon Territory, Canada, at the time of making the same; and that evidence of the service of the amended statement of claim and writ of summons was produced before the Territorial Court of Yukon Territory, which court at the rendition of its judgment had full and complete jurisdiction of the person of the defendant under and by virtue of those laws.

The plaintiff also moved the court for leave to file an amended complaint, in which it more fully and specifically stated the counts upon the promissory note alleged to have been executed by the defendant to Milan and by him assigned to the plaintiff, and the count for the goods and merchandise alleged to have been sold and delivered by the plaintiff to the defendant, constituting the causes of action upon which the Canadian judgment was obtained, and which it desired to join with the count upon that judgment in the court below. The court, however, refused to allow the amended complaint to be filed, and proceeded to the trial of the cause.

Upon the conclusion of all of the evidence the plaintiff again asked leave of the court to file its said amended complaint, which motion was also denied; the court still holding that the causes of action upon the note and upon the open account were merged in the Canadian judgment and that that judgment was conclusive upon the merits, but was, among other things, open to attack upon the question of jurisdiction. And the court below finally held that that judgment was void, for the reason that there was never any service of process upon the defendant, and accordingly dismissed the plaintiff's complaint upon the merits, with costs to the defendant.

The force and effect of foreign judgments was very carefully considered by the Supreme Court in the cases of Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95, and Ritchie v. McMullen, 159 U. S. 235, 16 Sup. Ct. 171, 40 L. Ed. 133. After a most elaborate review of the decisions and text-writers, the majority of the court said, in Hilton v. Guyot, 159 U. S. 202, 16 Sup. Ct. 158, 40 L. Ed. 95:

"In view of all the authorities upon the subject, and of the trend of judicial opinion in this country and in England, following the lead of Kent and Story, we are satisfied that where there has been opportunity for a full and fair trial provided, before a court of competent jurisdiction, conducting the trial by regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this

nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants therefore cannot be permitted, upon that general ground, to contest the validity or the effect of the judgment sued on."

But the court proceeded to show that such judgment may be impeached upon certain other grounds, saying, among other things:

"It must, however, always be kept in mind that it is the paramount duty of the court, before which any suit is brought, to see to it that the parties have had a fair and impartial trial before a final decision is rendered against either party. When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect." 159 U. S. 205, 16 Sup. Ct. 159, 40 L. Ed. 95.

In that particular case, in which a judgment of a court of France was involved, it was held not to be entitled to full credit and conclusive effect when sued upon in this country, but only to be considered as prima facie evidence of the justice of the plaintiff's claim, for the reason that by the laws of France our own judgments are there reviewable upon the merits, whereas the opposite effect must be here given to the judgment of an English court, for the reason that the law of England holds conclusive upon the merits a judgment of an American court, with the limitations and qualifications already indicated in respect to the want of jurisdiction, fraud, etc.

In the case in hand the sole objection made to the validity of the judgment in the case between these parties in the Territorial Court of Yukon Territory is the lack of service of process issued in that case upon the defendant.

The evidence shows that the Canadian statute applicable to the case provides, among other things, as follows:

"(13) Service of the writ of summons may be made by the sheriff, his deputy or bailiff, or by any other literate person other than a plaintiff, but, except by order of a judge, no fees for service shall in such latter case be allowed.

"(14) Service of writ of summons shall be effected by copy, as follows: (1) By personal service anywhere in the territories; (2) in case any defendant is out of the territories, but has an agent, managing clerk, or other representative resident and carrying on his business within the same, service of the writ of summons may be made on such agent, managing clerk, or other representative. * * *"
Consolidated Ordinances of the Northwest Territories of Canada 1898, p. 198.

The Canadian judgment roll introduced in evidence in the court below shows as the cause of the plaintiff's action there this statement of claim:

"(1) The plaintiff is a foreign corporation duly licensed to and is carrying on business at Dawson. Yukon Territory, Canada, and the defendant is a miner residing on Dominion creek, but is at present outside of the Yukon Territory.

"(2) The defendant is indebted to the plaintiff in the sum of $6,252.26, particulars of which are as follows:

| | |
|---|---:|
| To balance on account rendered.................................. | $2,995 00 |
| To amount of promissory note for the sum of $2,610.69, made by the defendant in favor of S. W. Milan on the 15th day of September, 1900, payable on or before September 15, 1902, with interest at the rate of 12 per cent. per annum. Said note was indorsed by the said Milan to the plaintiff, who is now the holder in due course. Said note was duly presented for payment and dishonored. .......................................... | 2,610 69 |
| Interest on said note from the date thereof until maturity at the rate aforesaid. .......................................... | 626 56 |
| Interest on said note from maturity to the date hereof at the rate of 6 per cent. per annum, 23 days......................... | 20 01 |
| | $6,252 26 |

—And the plaintiff claims the sum of $6,252.26, together with interest on the sum of $2,610.69 from the date hereof until judgment at the rate of 6 per cent. per annum.

"Dated at Dawson, Yukon Territory, October 11, 1902.

"Herbert E. A. Robertson, Solicitor for Plaintiff."

The writ of summons issued in the case is as follows:

"Canada, Yukon Territory.

"In the Territorial Court of the Yukon Territory. Between Alaska Commercial Company, Plaintiff, and Charles G. Debney, Defendant.

"Edward the Seventh, by the Grace of God, of the United Kingdom of Great Britain and Ireland and of the British Dominions Beyond the Seas King, Defender of the Faith, Emperor of India, to the Above-Named Defendant: You are notified that the plaintiff has entered an action against you in the above-named court, for the recovery of the claim or demand, a statement of which is filed in court and annexed to this summons. And you are commanded that if you dispute the said claim, either in whole or in part, you do, within eight days from the service of this writ on you, exclusive of the day of such service, cause to be entered for you in the office of the clerk of this court an appearance and within six days thereafter file with the clerk a statement of the grounds on which such dispute is based. And take notice that in default of your so doing, the plaintiff may proceed in his said action, and judgment may be given in your absence and without further notice to you.

"Issued at Dawson in the said Yukon Territory, this 11th day of October, A. D. 1902.

"[Seal T. G. Y. T.]

"[Signed] Charles MacDonald, Clerk of the Court."

The affidavit of service of the statement of claim and writ of summons, omitting the caption, is as follows:

"I, Jean Charles Brezier, N. W. M. P. of the Yukon Territory, make oath and say: (1) That I did, on Tuesday, the 21st day of October, 1902, serve Charles G. Debney, through William A. Debney, through his attorney in fact, the above-named defendant, with true copies of the writ of summons and statement of claim herein, hereunto annexed and marked respectively Exhibits A and B to this my affidavit. by delivering the said copies to, and leaving the same with, the defendant at Last Chance creek, being 15 miles

distant from the courthouse at Dawson. (2) That to effect such service .I necessarily traveled 18 miles.

[Signed] Jean Chas. Brezier, N. W. M. Police.

"Sworn before me at Gold Bottom, in Yukon Territory, this 22d day of October, 1902.

"[Signed] P. J. Ryan,

"A Commissioner for Taking Affidavits in and for the Yukon Territory."

The statement of claim was, according to the record, amended on Nov. 7, 1902, the affidavit of service of which amended statement, together with the summons, is as follows:

"I, J. C. Brezier, of N. W. M. Police, Hunker creek, in Yukon Territory, make oath and say: (1) That I did on Tuesday, the 11th day of November, 1902, personally serve Charles G. Debney, the above-named defendant, with true copies of the writ of summons and amended statement of claim herein, hereunto annexed, and marked respectively Exhibits A. and B, to this my affidavit, by delivering the said copies to, and leaving the same with. A. W. Debney, the duly authorized agent and attorney in fact of the defendant, at Last Chance creek, being 15 miles distant from the courthouse at Dawson. (2) That to effect such service I necessarily traveled 18 miles.

"[Signed] Jean Chas. Brezier.

"Sworn to before me at Hunker creek in Yukon Territory, this 12th day of November, 1902.

"[Signed] P. J. Ryan,

"A Commissioner for Taking Affidavits in and for the Yukon Territory."

The judgment roll also contains the following affidavit of the nonappearance of the defendant to the action, and the judgment:

"I, Herbert Ewen Arden Robertson, of Dawson, in the Yukon Territory, Canada, solicitor, make oath and say: (1) That I am solicitor for the plaintiff in this action; (2) that I did, on Tuesday the 25th day of November, A. D. 1902, personally search in the office of the clerk of this honorable court at Dawson, and found that no appearance had been entered by the defendant, or by any one on his behalf. Herbert E. A. Robertson.

"Sworn before me at Dawson, Yukon Territory, Canada, this 25th day of November, A. D. 1902.

"[Signed] Charles MacDonald,

"A Commissioner for Affidavits for Use in Yukon Territory."

The judgment and certificate of the Clerk of the court are as follows:

"Judgment.

"The defendant not having appeared to the writ of summons herein, it is this day adjudged that the plaintiff recover against the said defendant $6,270.96, and costs to be taxed.

"Dated this 25th day of November, 1902.

"[Seal T. C. Y. T.]

"[Signed] Charles MacDonald, Clerk of the Court.

"The plaintiff's costs in the above action on default of appearance have this day been taxed and allowed at $248.60.

"Dated this 25th day of November, 1902.

"[Signed] Charles MacDonald, Clerk of the Court.

"Filed in court November 25, 1902. C. M. C. C.

"And be it further known that the said Territorial Court of the Yukon Territory is a court of inherent, general, and unlimited jurisdiction in the said Yukon Territory, Canada, and having jurisdiction over the subject-matter and cause of this action; that the originals of all the said pleadings, pro-

ceedings, and judgment above mentioned are filed in my office, which is the proper office in that behalf, and I am the proper custodian of the same.

"In witness whereof I have hereunto set my hand and caused the seal of the Territorial Court of the Yukon Territory to be affixed at Dawson, in the Yukon Territory, Canada, this 21st day of October, A. D. 1904.

"[Seal.]      [Signed]   Charles MacDonald, Clerk of Territorial Court."

As has been said, the only point made against the validity of that judgment is that the service of the claim and summons was made on A. W. Debney, who, it is contended by the defendant and was held by the court below, was not "an agent, managing clerk, or other representative [of the defendant], resident and carrying on his business within" the Yukon Territory, and therefore not a person upon whom a valid service could, under the Canadian statute, be made. The court below said in its opinion:

"The real question in this case is one of fact. Was the defendant, after he left Dawson and returned to Alaska, represented in the Yukon Territory by Alfred W. Debney as 'an agent, managing clerk, or other representative, resident and carrying on his business'? If Alfred W. Debney was such an agent when the summons and claim were so served upon him in the fall of 1902, the Yukon court had jurisdiction; otherwise not."

The court below proceeded to consider the testimony upon that question, saying:

"The only testimony in this case, touching the business of the defendant in the Yukon Territory at the time this service was made, was given by defendant himself. His testimony was that about September, 1900, he sold all his mining property and all other interests in Yukon Territory, near Dawson, and returned to Alaska, where he has ever since resided, and that since said date he has had no business or property of any kind in Yukon Territory. Plaintiff offered no evidence in denial of defendant's statements, but on cross-examination offered some letters written in 1902, about the time the suit was brought in the Yukon courts, signed by A. W. Debney as the attorney in fact of defendant, to show that the agent was so acting for him. The evidence disclosed that a half interest in a valuable mining claim had remained in the name of an agent of plaintiff when defendant left Dawson; that defendant had sold that, with all other claims, to A. W. Debney; that plaintiff had refused to transfer it to A. W. Debney until a bill which they held against defendant for interest was paid; and that to secure himself A. W. Debney paid that amount and was credited by defendant for so doing. This is the only act of business which the evidence shows the agent to have done, except to demand the transfer of the half interest from plaintiff to himself, and falls far short of proving that the agent was carrying on defendant's business. It only proves that A. W. Debney was attending to his own business—that he procured possession of the half interest in the mine for himself, and not for the defendant. It must not be forgotten, either, that, while the letters are admitted on cross-examination to have been in the handwriting of A. W. Debney, they did not prove the facts stated in them, and these facts are explained or denied by defendant in line with his general evidence. Clearly, the preponderance of the evidence is with the defendant, and sustains his claim that A. W. Debney was not at the time of the service, or at any subsequent period, his 'agent, managing clerk, or other representative resident, carrying on his business within' Yukon Territory. He was armed with a power of attorney from defendant for the purpose of aiding him to reduce to his own possession property purchased by him from the defendant. It is my judgment that the service was void, and gave the Yukon court no jurisdiction, because it was not made in compliance with section 14, order 3, upon an agent carrying on defendant's business."

We do not think the court below drew the right conclusions from the defendant's testimony. It is true that he testified in effect, on direct examination, that prior to leaving Dawson and returning to the United States, about September, 1900, he sold all of his interests in Yukon Territory, and that since that date he has had no business or property of any kind therein. But we are of the opinion that, when the whole of the defendant's testimony is read and considered, it very clearly appears therefrom, even without the aid of other evidence in the case, that such was not the fact, but that, on the contrary, he did retain certain business interests in Yukon Territory, the management and handling of which he intrusted to his brother, A. W. Debney, by the following written power of attorney, which was introduced in evidence:

"Dominion Creek, Sept. 12, 1900.

"Know all men by these presents, that I, C. G. Debney, of Dawson, Y. T., do hereby appoint my brother, Alfred W. Debney, also of Dawson, Y. T., my true and lawful attorney, for me and in my place to transact any and all business relating to my interests in the Yukon Territory, and I hereby ratify any and all acts he may perform.                    C. G. Debney.

"Witness: Ed. Champlin."

In the course of the direct examination of the defendant he testified that he left Yukon Territory in September or October, 1900, and that at no time during the year 1902 was he in any portion of the Dominion of Canada; that at the time he left there he did not have any property or business of any kind or character in that territory, and had no agent or representative there in charge of any such interests; that the first he ever heard of the action against him in the Territorial Court of Yukon Territory was from a letter received from his brother, informing him that judgment had been entered against him. On cross-examination the defendant testified that he first went to Yukon Territory in 1896, arriving at Dawson on the 2d day of June of that year, and remained there until September or October of 1900. He admitted the execution to his brother, A. W. Debney, of the power of attorney above set out, in respect to which he testified on cross-examination:

"I gave that power of attorney, I believe, before I left the country; that is, between the time I gave my brother that power of attorney and the time I left, I believe, I sold out to him everything I had. At the time I gave that power of attorney I probably had some interests that I wanted him to look out for before I left.

"Q. 36. Then at the time you gave this power of attorney you had interests in Dawson? A. I expect I had.

"Q. 37. Well, do you know? A. I do not know.

"Q. 38. You had been engaged in the business of mining on Dominion creek, had you not? A. I had been.

"Q. 39. Were you, up to the time you left the Yukon? A. I don't believe right up to the day.

"Q. 40. Within three days, wasn't it? A. I don't know how close to the time I left I was engaged in mining.

"Q. 41. Well, was it up to three years before you left? A. No, sir.

"Q. 42. Was it one month? A. I don't remember how long it was; that I actually quit mining.

"Q. 43. You had a large plant on Dominion creek, didn't you? A. I had, at one time.

"Q. 44. When was that disposed of? A. I don't remember the date.

"Q. 45. Was it before or after you signed this power of attorney, plaintiff's Exhibit C? A. I don't remember.

"Q. 46. You procured from the Department of the Interior of Canada a miner's license to carry on mining business in the Yukon Territory, didn't you? A. Several of them.

"Q. 47. You had one in full force at the time you left the Yukon Territory? A. I did not.

"Q. 48. Your brother took out one for you the following year? A. I don't know.

"Q. 49. He never wrote and told you of that? A. He did not.

"Q. 50. The concluding line of this power of attorney, plaintiff's Exhibit C, where it says, 'And I hereby ratify any and all acts he may perform'; You haven't ratified everything that your brother has done, have you? A. The only business that my brother did for me since I left the Yukon Territory has been to pay the Alaska Commercial Company $2,404 interest, which they extorted from him. I don't know whether I have ratified that or not.

"Q. 51. Then your brother has acted for you since you left the Yukon Territory? A. Well, the A. C. Company--

"Q. 52. Answer the question, please; yes or no. A. He paid the company this money.

"Q. 53. For you as your agent? A. It was part of the money that he owed me, and the company forced him to pay it.

"Q. 54. You say you don't know whether it was before you gave the power of attorney or afterwards that you ceased business in the Yukon Territory? A. I don't know.

"Q. 55. You know that this power of attorney, C, was recorded on the public records in the Yukon Territory? A. I don't; but I believe there is a notation on it that it has been recorded.

"Q. 56. How long have you held this paper in your possession, plaintiff's Exhibit C? A. I don't know.

"Q. 57. Well, about how long? A. I don't remember the date. I couldn't say.

"Q. 58. Where did you get it? A. From Dawson.

"Q. 59. How? A. By letter.

"Q. 60. From whom? A. From my brother.

"Q. 61. Have you the letter? A. I don't believe I have.

"Q. 62. Have you had it over a year? A. I might have.

"Q. 63. Have you had it two years? A. I don't believe I have. I don't remember the date I got it.

"Q. 64. When you received it, you knew from the stamp on the back of it that it had been recorded and made a public record in Dawson? A. If I noticed the stamp.

"Q. 65. Well, did you notice the stamp? A. I don't remember.

"Q. 66. Did you notice it until I showed it to you just now? A. I don't believe I did.

"Q. 67. Have you ever revoked that power of attorney, plaintiff's Exhibit C? A. I haven't ever revoked it that I know of.

"Q. 68. Has it been revoked that you don't know of? A. I don't believe so.

"Q. 69. Well, do you know? A. I don't remember having revoked it myself.

"Q. 70. When did you first receive notice of the suit that had been commenced against you in the Yukon Territory? A. Well, I don't remember the date. I got a letter.

"Q. 71. About when? A. Oh, some time after the judgment had been rendered against me.

"Q. 72. In answer to your counsel, a few moments ago, you said December 1, 1902—

"Mr. Smith (Attorney for Defendant): That is a misquotation. I asked the witness whether he had heard of it prior to that date, and he said, 'No.'

"Q. 73. Did you hear of it about December, 1902? A. I heard of it, but I don't remember the date.

"Q. 74. You received a letter from your brother notifying you of it? A. Notifying me about the judgment.

"Q. 75. Did he send the papers to you? A. No, sir.

"Q. 76. Have you that letter? A. No, sir."

The defendant was then asked in respect to three letters, which he testified were in the hand writing of his brother, signed by him as attorney in fact for the defendant. The defendant also admitted in his testimony that "8 Below Upper Discovery" means Dominion creek. The three letters last referred to are as follows:

"Plaintiff's Exhibit D.

"Alaska Commercial Co. (a Corporation), Plaintiff, v. Charles G. Debney, Defendant.

"[Stamped in left-hand corner: Alaska Commercial Co. Received Jul. 1, 1902. Ans'd filed. Dawson, N. W. T.]

"8 Below Upper Discovery, June 28, 1902.

"Alaska Commercial Co., Wm. M. Heron, Agt.—Dear Sir: Referring to the payment of the sum of $2,404.00 due for interest on the account of C. G. Debney: Mr. Kievicz will have informed you of the returns from No. 8. I have been compelled to draw upon my share from this source to meet personal indebtedness, which mostly consisted of balance of payment of 60 cords of wood now on Discovery. I inclose herewith an order on Mr. Kievicz to pay to you all money accruing on my share of the output of No. 8, and you are hereby authorized to collect the money due to me as rental for machinery (¼ of total), when due, and credit same to C. G. Debney. To more perfectly secure the said payment, and as an evidence of good faith, I hereby pledge an undivided half interest in the machinery plant now on No. 8 Below Upper Discovery, Dominion Creek and unincumbered, to be sold, and the proceeds applied to the payment above mentioned, if necessary to secure the same. I trust this will be satisfactory so far as security is concerned. In addition I wish to say that I am quite confident of my ability to pay up the entire indebtedness within eight weeks from the time I commence work on Discovery, and it is my intention to apply the entire output, over expenses, to this purpose. All I ask is to be given a chance to show good faith in this matter. I expect to be ready to shovel in in about ten days. Have your collector call in the latter part of the month, and if you are not satisfied with the rate of payment, proceed in your own way.

"Yours respectfully,

A. W. Debney, Attorney in Fact for C. G. Debney."

"Plaintiff's Exhibit E.

"Alaska Commercial Company (a Corporation), Plaintiff, v. Charles G. Debney, Defendant.

"No. 2 Ab. Dis. Last Chance, Oct. 22d, 1902.

"Wm. M. Heron, Dawson—Dear Sir: Yesterday I received a summons from the Territorial Court, issued by H. E. A. Robertson on behalf of the A. C. Co. Statement of the complaint cites claim for $2,404.00 balance due on acct., in addition to the sum due, with interest, on note made by C. G. Debney to S. W. Milan. Kindly notify Mr. Robertson of the error. If you wish to obtain judgment against C. G. D. on the note I will not appear in defense.

"Yours truly,                                    A. W. Debney."

"Plaintiff's Exhibit F.

"Alaska Commercial Company (a Corporation), Plaintiff, v. Charles G. Debney, Defendant.

"Thos. A. McGowan.

"Dawson, Y. T., Oct. 10, 1902.

"J. E. Hansen, Esq., Agent Alaska Commercial Company—Dear Sir: You are hereby instructed to transfer my one-half interest in Upper Discovery on Dominion creek held by you as security for account of Alaska Commercial Company to A. W. Debney, my brother, and attorney in fact. This is done for the reason that I at this time have no miner's license, and for convenience.

"Yours very truly,                    Charles G. Debney,

"By A. W. Debney, His Attorney in Fact."

On his redirect examination the defendant testified that he never authorized any one to accept service of process for him in the Yukon Territory, and that he never authorized his brother, A. W. Debney, to enter into an agreement with the Alaska Commercial Company for it to take judgment by default against him, and that he did not have any business or interests of any kind or character in the Yukon Territory during any portion of the year 1902. Upon his recross-examination he was questioned, and answered, among other things, as follows:

"Q. 100. At the time you left Dawson, did an undivided half interest on Upper Discovery stand in the name of Capt. Hansen, as agent for the Alaska Commercial Company, as trustee to secure an indebtedness? A. It did not.

"Q. 101. Do you swear positively to that? A. I do; I didn't owe the company a cent.

"Q. 102. Did an undivided half interest in Upper Discovery in the Yukon Territory, on the day you left Dawson in the year 1900, stand in the name of J. E. Hansen, as agent of the Alaska Commercial Company? A. It did not stand in the name of J. E. Hansen, as agent of the Alaska Commercial Company, I guess; but not to secure an indebtedness.

"Q. 103. How long did it continue to stand in Capt. Hansen's name, as agent of the Alaska Commercial Company? A. I don't know how long it stood in his name.

"Q. 104. Did you ask the Alaska Commercial Company to have it transferred to you prior to the time you left Dawson? A. I asked the Alaska Commercial Company to transfer that half claim back to me when I paid up my indebtedness.

"Q. 105. Did they do that? A. Capt. Hansen was not there.

"Q. 106. Was his attorney ever there? A. I don't know.

"Q. 107. Did your brother have a right to demand from Hansen, as agent of the Alaska Commercial Company, the transfer of that property? A. It was not necessary for my brother to ask them—

"Q. 108. Answer the question yes or no. A. He did not. I got a promise from the Alaska Commercial Company before I went away that that would be transferred.

"Q. 109. Your brother had no right to sign your name to this plaintiff's Exhibit 'F'? A. Nor those other exhibits either."

"Q. 111. Did your brother write to you that he had asked the Alaska Commercial Company to transfer half of Upper Discovery? A. He said they would not do it because they wanted to exact interest from him; then he wrote me that half the claim had been transferred to him, and he had paid them.

"Q. 112. At the time your brother wrote you telling you that the Alaska Commercial Company had refused to transfer this claim back to you, did you write to your brother telling him to go and have it done? A. I don't remember that I did.

"Q. 113. Will you swear that you did not? A. No, sir.

"Q. 114. Then you probably wrote to him? A. I probably did.

"Q. 115. Telling him to go to the Alaska Commercial Company and get that claim? A. That was the understanding. The claim was to be transferred to me.

"Q. 116. If you wrote to him telling him to do that, he had a right to give them, this plaintiff's Exhibit F, this request? A. That half interest was deeded. to the Alaska Commercial Company as security for an indebtedness, which I paid; and, if Capt. Hansen had been there when I paid it, it would have been deeded to me, and I would have deeded it to my brother.

"Q. 117. After your brother had written you telling you that the agent of the Alaska Commercial Company demanded $2,404 before they would deliver up this claim, did you write your brother to make a demand? A. I may have suggested to him to go to the Alaska Commercial Company.

"Q. 118. You suggested to him to go to the Alaska Commercial Company and get it? A. I probably did.

"Q. 119. Didn't you say, 'Go and make them give it up'? A. I don't think so; I don't remember.

"Q. 121. (By Mr. Smith, counsel for defendant.) Before you left the Yukon Territory, to whom did you sell this half interest in Upper Discovery on Dominion creek? A. To my brother.

"Q. 122. Have you ever had any interest in that claim since you left the Yukon Territory? A. None whatever.

"Q. 123. (By Mr. McGowan, attorney for plaintiff.) Your brother charged you up with the $2,404 he paid for you in the year 1902? A. I expect he did charge me up with it because he owed it to me; I credited it on the note that he owed me.

"Q. 124. (By Mr. Smith.) You have stated that before leaving the Yukon Territory you had sold to your brother this half interest on Upper Discovery on Dominion creek, being the claim referred to in these letters. I will ask you to state if you were in any way interested in who owned it or had the title to it? A. I had no interest in that property—no interest in Dawson or on the creeks—when I left there.

"Q. 125. And these letters referring to the retransfer, did they refer to your brother's property or to yours? A. These letters signed by my brother as attorney for me are in relation to his own interests. They were not in relation to my interests at all. I did not have any interest when I left there. I sold out to him, and he gave me a note. The Alaska Commercial Company, through their agent, Mr. Heron, because I would not pay some merchandise accounts which were contracted by laymen on one of the claims I was not interested in, gets angry and goes over my account, and sees where I have been owing the company. at different times—at one time several thousand dollars—and see a chance to charge me interest, and to be able to collect it, because they have this half claim in Capt. Hansen's name, which was not transferred to me because Capt. Hansen was not there when I left, and before they would deed this interest back to my brother make him pay $2,404 as interest.

"Q. 126. Did you ever authorize your brother, A. W. Debney, to sign your name to any papers in reference to this claim on Upper Discovery, Dominion creek, after you had transferred the same to him? A. No, sir.

"Q. 127. (By Mr. McGowan.) You say you know it to be a fact, and that it was not hearsay, that Mr. Heron went over your account on the books of the Alaska Commercial Company, on which it appeared that you owed the company, and rechecked that account, and charged you some interest? A. That is how he arrived at the $2,204 interest.

"Q. 128. Who told you that? A. I got a letter from my brother that that was what the amount was for.

"Q. 129. When did you get that letter? A. I don't remember.

"Q. 130. That was in the year 1902? A. It might have been; I don't remember the date.

"Q. 131. Your brother wrote and told you what he had done with the Alaska Commercial Company—with Mr. Heron—going through your account? A. I expect he did; I settled my account.

"Q. 132. Did you write back to your brother, and tell him not to go back through your account with Mr. Heron? A. I did not.

"Q. 133. All the testimony that you gave a moment ago in answer to Mr. Smith's questions on that incident was hearsay—in reference to the company's actions in Dawson—that was hearsay, was it not, in reference to what Mr. Heron did after you left Dawson? A. It was not.

"Q. 134. Do you know what hearsay means? Do you know that of your own knowledge? A. I do.

"Q. 135. How? A. As I told you, I got a letter from my brother.

"Q. 136. Your brother told you? A. Yes, sir.

"Q. 137. And that is the only way you know it? A. Yes, sir.

"Q. 138. Your brother apparently was discussing your account with Mr. Heron and the Alaska Commercial Company in 1902? A. I don't believe he was discussing it. Mr. Heron simply said he wanted this $2,204.

"Q. 139. Who did he say it to? A. My brother.

"Q. 140. Where? A. Probably on Dominion or Hunker creek.

"Q. 141. Mr. Heron was out there? A. Probably.

"Q. 142. You are sure your brother did not go to the office of the Alaska Commercial Company? A. I don't know.

"Q. 143. Your brother may have gone there, might he not? A. Might have.

"Q. 144. He might have gone through the books with Mr. Heron? A. I don't think he did.

"Q. 145. I suppose you haven't that letter either, from your brother? A. I have not.

"Q. 146. He seems to have arrived at a very satisfactory arrangement with Mr. Heron about the $2,204? A. He had to pay it. It was not very satisfactory to him, I guess. He had to scrape pretty hard to get the money.

"Q. 147. When your brother wrote this letter, plaintiff's Exhibit D, it is headed '8 Below Upper Discovery,' that is Dominion creek, isn't it? A. Yes, sir.

"Q. 148. And that is about 60 miles from Dawson? A. About 65.

"Q. 149. When he wrote that letter Mr. Heron was not there at that time? A. I don't think so.

"Q. 150. He addressed that to the Alaska Commercial Company at Dawson, and signed your name to it? A. He signed my name to it."

A part, at least, of the claim of the plaintiff against the defendant, according to his own testimony, grew out of business transactions between the parties in Yukon Territory, and in the course of his mining operations there. He had transferred to an agent of the plaintiff, as security for his indebtedness, an interest in a mining claim on Dominion creek. Certainly, the matter of that indebtedness had not, according to the defendant's own testimony, been settled when he left the territory, and it is equally certain that before leaving he appointed his brother, A. W. Debney, his attorney to represent him in that territory and transact any and all business relating to his interests therein. We think it clear that the evidence shows, without any substantial conflict, that A. W. Debney was the defendant's agent and legal representative, within the meaning of the provision of the Canadian statute in question, and that the service upon him in the action there brought was a valid service, and, accordingly, that the judgment there rendered was a valid judgment. It results that the judgment of the court below must be reversed, without reference to the other questions discussed by counsel.

The judgment is reversed, and cause remanded for further proceedings.